## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| **HETTINGER EXCAVATING LLC AND HETTINGER TRUCKING LLC,** | § § § | |
| *Plaintiffs,* | § § | |
| **v.** | § § | Case No. _____ |
| **ERC SPECIALISTS LLC**, a Utah limited liability company, **MARK SULLIVAN**, an individual, **JUSTIN ATKINSON**, an individual, **JOSH ZIEGLOWSKY**, an individual, **JACOB DAVIS**, an individual, **CHANDLER CHAVIS**, an individual, **GERI BOHN**, an individual, and **ROCKY CROFTS**, an individual, **LOGISTICS GIVING RESOURCES, LLC** d/b/a LG Resources a/k/a LG Hires, a Utah limited liability company, | § § § § § § § § § § § | |
| *Defendants.* | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs Hettinger Excavating LLC and Hettinger Trucking LLC ("Plaintiffs", "Hettinger") by and through its attorney of record, and files this Original Complaint. In support of such claims and causes of action, Plaintiffs respectfully submit as follows:

### INTRODUCTION

1. Plaintiffs seek to recover money that the Defendants fraudulently obtained from the Plaintiffs by preparing and submitting tax filings for Employment Retention Tax Credit ("ERTC") under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act of 2020.

2. Plaintiffs do not specialize in the preparation of tax returns, nor do they have any experience in tax or finance related matters. Plaintiff Hettinger Excavating is a construction

1

company located in Missouri that focuses on water and utility commercial construction, new construction, demolition, tree clearing, street repair and building pads, and more. Plaintiff Hettinger Trucking is a trucking company based in Missouri. Both Hettinger Excavating and Hettinger Trucking have a common ownership structure and can therefore be considered a single entity.

3.  Defendant, ERC Specialists LLC ("ERCS"), claims to understand and maximize ERTC for the benefit of small businesses impacted by COVID-19.

4.  At all times relevant herein, ERCS was actively advertising, marketing, promoting, and retaining clients from its headquarters located in Orem, Utah.

5.  Upon information and belief, Defendant, Logistics Giving Resources, LLC ("LGR"), was actively working as an ERCS affiliate and referral source, funneling businesses to ERCS while advertising that they themselves understood and would maximize ERTC for the benefit of small businesses impacted by COVID-19.

6.  At all times relevant herein, and upon information and belief, LGR was actively advertising, marketing, promoting, and retaining clients from its headquarters located in Layton, UT.

7.  Plaintiffs, while aware of the introduction of ERTC, did not consider applying for the credit until they were induced by Defendants to have and analysis of its eligibility conducted and ultimately enter into a contractual relationship with ERCS.

8.  Relying on the marketing by Defendants, on August 20, 2022 and August 24, 2022, Plaintiffs executed contracts with Defendants to determine Plaintiffs' eligibility to claim the ERTC (the "Agreements"). These contracts were transmitted from the state of Utah, where all Defendants

side, to the state of Missouri, where Plaintiffs reside, for electronic signature via the Internet, using DocuSign. Copies of these Agreements are attached together as Exhibit A.

9. Along with the execution of the Agreements, Plaintiffs completed an online intake questionnaire regarding any potential impacts it may have suffered. A copy of the questionnaire is attached herein as Exhibit B.

10. Based on the responses made by the Plaintiffs in the questionnaire, Defendants concluded that Hettinger Excavating was entitled to ERTC under the CARES Act for the second, third, and fourth quarters of 2020 and the first and second quarters of 2021.

11. Defendants further concluded Hettinger Trucking was eligible for the second, third, and fourth quarters of 2020 and the first, second and third quarters of 2021. For ease of reference, quarters for which Plaintiffs are eligible are reproduced below:

| Hettinger Excavating | |
|---|---|
| Quarter / Year | Credit |
| Q2 2020 | $   57,547.00 |
| Q3 2020 | $   37,343.00 |
| Q4 2020 | $   13,920.00 |
| Q1 2021 | $ 149,998.00 |
| Q2 2021 | $ 152,475.00 |
| Total | $ 411,283.00 |

| Hettinger Trucking | |
|---|---|
| Quarter / Year | Credit |
| Q2 2020 | $   15,290.00 |
| Q3 2020 | $   16,373.00 |
| Q4 2020 | $     4,015.00 |
| Q1 2021 | $   21,793.00 |
| Q2 2021 | $   17,467.00 |
| Q3 2021 | $   43,269.00 |
| Total | $ 118,207.00 |

12. Defendants induced Plaintiffs to allow Defendant ERCS, to file the Form 941-X on behalf of Plaintiffs, without further discussion. Plaintiffs received the ERTC refund for the quarters

mentioned above amounting to a sum of $529,490.00. Pursuant to the consideration clauses in the Agreements, Plaintiffs made payments amounting in total to a sum of $79,423.50. Copies of the Invoices and Payment Proof are attached herein as Exhibit C.

13. However, by the time Plaintiffs were to start receiving funds from the IRS, substantial concerns were raised about the scope of the ERTC claimed. Plaintiffs retained a third-party to investigate its ERTC claims and, pursuant to the secondary review, realized that Defendants had not performed even the most basic due diligence required, prior to providing its much-publicized services. In fact, it appeared that Defendants had failed to meaningfully evaluate even the most basic information necessary to determine if the requirements for ERTC eligibility were met.

14. For example, eligible employers can claim employment retention credit on an original or amended employment tax return for qualified wages paid between March 13, 2020, and Dec. 31, 2021, if employers have either (a) sustained a full or partial suspension of operations due to an order from an appropriate governmental authority limiting commerce, travel or group meetings because of COVID-19, or; (b) experienced a significant decline in gross receipts during 2020 or the first three quarters of 2021, or; (c) qualified as a recovery startup business for the third or fourth quarters of 2021.[1] However, for most quarters at issue, Plaintiffs have not suffered impacts under any of these tests.

15. Plaintiffs had not suffered a significant decline in gross receipts, as described in section 2301(c)(2)(B) of the CARES Act. For Plaintiffs to qualify under a significant reduction in gross receipts, the company needs to incur a greater than 50% reduction in gross receipts, when comparing quarters of 2020 to 2019 and /or a greater than 20% reduction, when comparing 2021's

---

[1] See https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit#eligibility.

quarterly gross receipts to 2019.[2] An examination of all the documentation provided by Plaintiffs clearly show that there was no such significant decline.

16. Plaintiffs also did not experience a full or partial suspension of business operations for any quarter beyond Q2 of 2020. FAQ#17 of IRS Notice 2021-20 states that there must be a modification of operations due to a governmental order, that has a more than *nominal effect* on the business operations. In short, the mere fact that an employer must make a modification to business operations due to a governmental order does not result in a partial suspension, unless the modification has more than a nominal effect on the employer's business operations.

17. For Plaintiffs, there was no data that could demonstrate a more than nominal impact because of governmental orders beyond one quarter. This is pertinent as FAQ#70 of IRS Notice 2021-20 states that an eligible employer must be able to adequately substantiate eligibility for ERTC by maintaining <u>any</u> records the employer relied upon to determine whether more than a nominal portion of its operations were suspended due to a governmental order, or whether a governmental order had more than a nominal effect on its business operations.

18. Finally, Defendants failed to treat Hettinger Trucking and Hettinger Excavating as a single entity for tax filing purposes, an egregious oversight considering the two entities share the same name. This oversight resulted in any analysis being questionable. FAQ#7 of IRS Notice 2021-20, employers required to be aggregated are treated as a single employer for purposes of the rules applicable for employee retention credit. This includes the following rules:

  i. Rules determining whether the employer has a trade or business operation that was fully or partially suspended due to orders related to COVID-19 from an appropriate governmental authority;

---

[2] IRS Notice 2021-20, FAQ#23.

ii. Rules determining whether the employer experiences a significant decline in gross receipts;

iii. Rules determining whether the employer averaged more than 100 full-time employees; and

iv. Rules determining the maximum credit amount per employee.

19. Ignoring all the information even the most basic review would have uncovered, Defendants qualified Plaintiffs for a significant amount of ERTC.

20. Plaintiffs, being inexperienced in the area of tax law and the rules governing ERTC in particular, were unaware of the faults in Defendants' analysis at the time. Once aware of these deficiencies, Plaintiffs returned the ERTC by applying under the IRS Voluntary Disclosure Program ("VDP").

21. As a result, Plaintiffs have suffered damages. Not only did Defendants divest them of a value to which they are legally entitled based on a separate agreement with the government, they paid a fee greater than was allowable under the contract, and for services not rendered. Additionally, they incurred additional, necessary costs when they hired a third party to perform the services that Defendants were supposed to have provided, so that an accurate and reliable determination could be made as to its eligibility.

22. Defendants, in its representations online, clearly imply that they have an expertise in identifying and calculating ERTC for its clients.[3] ERCS's website clearly states that its team strictly focuses on ERTC with the aim of helping clients claim the most credit that all questions raised would be answered by a dedicated team of support specialists. LGR, through videos of its

---

[3] ERCSpecialists.com; https://web.archive.org/web/20240714175710/https://19545538.fs1.hubspotusercontent-na1.net/hubfs/19545538/Broker%20Recruiting%20250%20(MP)(JD)%20v9%20(1)%20(1).pdf

principals on their website, specifically state they have a "team of specialists from tax attorneys to tax CPAs, administrative staff that's experts in exactly this one thing, called ERC."[4]

23. However, the reality is that very little, if any meaningful analysis and review was performed. Defendants do not have any special expertise in evaluating an entity's eligibility for ERTC, or if they do, they did not use said expertise, when reviewing Plaintiffs' availability. Rather, upon information and belief, Defendants qualified Plaintiffs based on a questionnaire, without any additional investigation.

24. To obtain just compensation for these fraudulent acts, Plaintiffs raises causes of action under Title 18, United States Code, Sections 1962 (c) and (d), and Section 1964 ("RICO"). Plaintiffs also raise additional causes of action involving violations of §§ 13-11a-3, 13-11a-4 of Utah's Truth in Advertising/Deceptive Trade Practices Statute, as well as other common law related causes of action to address the damages caused to Plaintiffs by Defendants.

25. Pursuant to the sections cited above, Plaintiffs seek actual damages, treble damages, plus interest thereon, and the costs of this suit, including reasonable attorneys' fees.

## **PARTIES**

26. Plaintiff, Hettinger Excavating LLC (hereinafter referred to as **"Hettinger Excavating"**) is a construction company located in Missouri that focuses on water and utility commercial construction, new construction, demolition, tree clearing, street repair and building pads, and more. Hettinger Excavating has its registered and principal place of business at Rt. 1 Box 40 Drexel, MO 64742.

---

[4] *See* the video statement of Micael Perog, available at
https://us02web.zoom.us/rec/play/npQIIIrS8qrJo9hiF6d5r3rOlIeUE6rUX0qHBUHK82REgWtLnOTFp5xdAw05M
Ab3jpfpXUbxKlFoSGk.cDr6aDbmv4flCpic?eagerLoadZvaPages=sidemenu.billing.plan_management&accessLeve
l=meeting&canPlayFromShare=true&from=share_recording_detail&startTime=1627241620000&componentName
=rec-
play&originRequestUrl=https%3A%2F%2Fus02web.zoom.us%2Frec%2Fshare%2F4jJnM4FxpUCb1VjQmyYtYQ
yafdP5uZ3fGZazO1Xn9e_exzMlp1qfYbliHZ9ub7lZ.Bq9nDJS6nwu02lWW%3FstartTime%3D1627241620000

27. Plaintiff, Hettinger Trucking LLC (hereinafter referred to as "Hettinger Trucking"), is an trucking company in Drexel, Missouri. Hettinger Trucking has its registered and principal place of business at Rt. 1 Box 40 Drexel, MO 64742.

28. Defendant, ERCS is a domestic limited liability company organized under the laws of the State of Utah, with its principal place of business at 560 E. Timpanogos Circle, Orem, UT 84097. It may be served through its registered agent, Rocky Crofts, at 560 Timpanogos Circle, Orem, UT 84097 or wherever it may be found. At all times relevant herein, ERCS was actively advertising, marketing, promoting, and retaining clients from their headquarters located in Orem, Utah.

29. Defendant, Mark Sullivan, ("Sullivan") is an individual who, upon information and belief, is a citizen and resident of the state of Utah.

30. Defendant, Justin Atkinson, ("Atkinson") is an individual who, upon information and belief, is a citizen and resident of the state of Utah.

31. Defendant, Josh Zieglowsky, ("Zieglowsky") is an individual who, upon information and belief, is a citizen and resident of the state of Utah.

32. Defendant, Jacob Davis, ("Davis") is an individual who, upon information and belief, is a citizen and resident of the state of Utah.

33. Defendant, Chandler Chavis, ("Chavis") is an individual who, upon information and belief, is a citizen and resident of the state of Utah.

34. Defendant, Geri Bohn, ("Bohn") is an individual who, upon information and belief, is a citizen and resident of the State of Utah. Bohn is a Certified Payroll Professional (CPP) licensed by the American Payroll Association (APA), practicing in the state of Utah.

35. Defendant, Rocky Crofts ("Crofts") is an individual who, upon information and belief, is a citizen and resident of the State of Utah. Crofts is an attorney licensed to practice in the State of

Utah, an active member of the State Bar of Utah and the listed registered agent for ERC Specialists, LLC. He may be served at 560 Timpanogos Circle, Orem, UT 84097, or wherever he may be found.

36. Defendant, Logistics Giving Resources, LLC d/b/a LG Resources a/k/a LG Hires, is a domestic limited liability company organized under the laws of the State of Utah, with its principal place of business at 721 North Main Street, Layton, UT 84041.  It may be served through its registered agent Troy Hyde, at the same address. At all times relevant herein, LGS was actively advertising, marketing, promoting, and retaining clients from their headquarters located in Layton, Utah.

## JURISDICTION AND VENUE

37. Pursuant to Title 28, United States Code, Section 1331, this Court has subject matter jurisdiction over the claims alleged in Counts I and II because such claims arise under the laws of the United States, specifically Title 18, United States Code, Sections 1962(c) and (d), and Section 1964(c). Further, this Court has subject matter jurisdiction over the claims in Counts III and IV pursuant to 28 U.S.C. §1367(a) because they are so related to the RICO claims they form part of the same case and controversy.

38. Pursuant to Title 28, United States Code, Section 1367, this Court has subject matter jurisdiction over the state common law fraud, conspiracy, unjust enrichment, and money had and received claims alleged in Counts V through VII, because they are so related to the RICO claims they form part of the same case or controversy.

39. In the alternative, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000.00 and the parties are citizens of different states.

Plaintiffs are situated and citizens of Missouri, and upon investigation, all Defendants are assumed to be citizens and residents, of or incorporated within, the State of Utah.

40. Venue is proper in this Court under 28 U.S.C. § 1391(b) in that all Defendants are residents of, or incorporated within, the State of Utah, in the judicial district in which this court is located. In addition, a substantial part of the events or omissions giving rise to this claim occurred within this District. Venue is also proper under 18 U.S.C. § 1965.

## STATEMENT OF FACTS COMMON TO ALL CAUSES OF ACTION

41. In 2020, when the Coronavirus pandemic struck the United States, it resulted in unprecedented shutdowns of American businesses across the country. In response, the United States federal government enacted the CARES Act in an attempt to soften the immense financial impact on American businesses in a multitude of industries. The provision for ERTC was introduced under the CARES Act, in a bid to aid small to mid-sized businesses meeting specified criteria, by offsetting the substantial impact of Covid-19.

42. ERTC is a refundable tax credit available for certain eligible businesses and tax-exempt organizations that have employees and were affected during the COVID-19 pandemic.

43. To claim the ERTC retroactively, an employer files a Form 941-X for each payroll tax quarter in which it is determined eligible, with Internal Revenue Service ("IRS"). If claimed correctly, the IRS would determine the claim to be an overpayment of tax for the specified quarter(s) and would issue a refund check to the employer.

44. Defendants have formed a tax consultancy enterprise that specifically targets small businesses with big promises to obtain them hundreds of thousands of dollars, if not millions of dollars, from the federal government that, very often, the small businesses are not qualified to receive.

45. Defendant ERCS was set up in 2020 with the sole purpose of assisting businesses in claiming ERTC. To this end, Defendant ERCS reached out to various affiliates in a bid expand the reach of its services.

46. Defendant LGS is a human resources/staffing company that, upon learning the lucrative nature of ERCS' affiliate program, decided to leverage its contacts for profit through the enterprise it formed with ERCS defendants.

47. Defendant ERCS "evaluates" a customer's eligibility for ERTC in consideration for a percentage of the ERTC eventually claimed (roughly between 10% to 20% of the ERTC received). As such, it is in Defendant ERCS's interest to conclude that clients are eligible for a higher amount. It is unclear, at this time, how much or how little Defendant LGS participated in the actual review process of the clients they funneled to ERCS.

48. Defendant LGS furthered Defendant ERCS's multilevel marketing scheme by marketing for its own affiliates, creating a pyramid payment sort of arrangement.

49. Both ERCS and LGS, and presumably all additional affiliates, have remuneration structures that are dependent on the scope and number of ERTC claims filed. This payment structure gives cause for concern. In its website, the IRS has warned taxpayers to avoid a tax preparer basing their fee on the size of the refund.[5]

50. Further, the IRS has repeatedly issued multiple warnings to businesses and others to stay clear of unscrupulous and aggressive promoters of questionable claims for the employee retention credit.

---

[5] See https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit#scams.

51. The IRS laid out a list of traits/characteristics exhibited by such entitles in a bid to help taxpayers identify such scam promoters.[6] Defendant ERCS exhibits some of these traits as enumerated below:

    a.   Unsolicited calls or advertisements mentioning an "easy application process".

    b.   Offers to check your eligibility "in minutes" on a website or app, in person or by phone.

    c.   Large up-front fees to claim the credit.

    d.   Pressure to accept a promoter's offer of a refund anticipation loan.

    e.   Fees based on a percentage of the refund amount of ERTC claimed. This is a similar warning sign for average taxpayers, who should always avoid a tax preparer basing their fee on the size of the refund.

    f.   Preparers refusing to sign the employee retention credit return being filed by the business, exposing just the taxpayer claiming the credit to risk.

    g.   Aggressive claims from the promoter that the business receiving the solicitation qualifies before any discussion of the group's tax situation. In reality, the employee retention credit is a complex credit that requires careful review before applying.

    h.   Pressure to claim the credit because "every business qualifies" or because a business like yours received the credit. Eligibility for the employment retention credit is complex and based on each business's facts and circumstances.

    i.   Wildly aggressive suggestions from marketers urging businesses to submit the claim because there is nothing to lose. In reality, those improperly receiving the

---

[6] See https://www.irs.gov/newsroom/learn-the-warning-signs-of-employee-retention-credit-scams.

credit could have to repay the credit – along with substantial interest and penalties.

52. In addition to the above, the IRS has raised more red flags on employment retention claims that exhibit the following characteristics, of which Defendants have routinely exhibited[7]:

a. Urge employers to claim employment retention credit for all quarters that the credit was available. Qualifying for all quarters is uncommon and could be a sign of an incorrect claim.

b. Tell employers they can claim employment retention credit if any government order was in place in their area, regardless of the authority that issues the order, or the impact of the order on business operations. In other words, they do not consider if the operations were affected or not.

c. Qualify employers due to supply chain disruptions. A supply chain disruption by itself does not qualify an employer for employment retention credit.

d. Claim credit for too much of a tax period. It is uncommon for an employer to qualify for employment retention credit for the entire calendar quarter if their business operations were fully or partially suspended due to a government order during a portion of a calendar quarter.

53. Given the nature of the compensation structure among the Defendants; the aggressiveness of its marketing and publicity campaigns; the process (or lack thereof) by which it determines eligibility; the contingent nature of its fees; the scope of its employment retention claims (specifically with respect to the number of quarters involved and the amount of credits claimed) it

---

[7] *See* https://www.irs.gov/newsroom/dirty-dozen-beware-of-aggressive-promoters-who-dupe-taxpayers-into-making-questionable-employee-retention-credit-claims-risks-continue-for-small-businesses-special-withdrawal-program-remains-available.

is clear that Defendants ERCS, LGS and other named Defendants act in accord as scam promoters or "ERC Mills".

## DEFENDANTS OPERATIONS AS SCAM PROMOTERS
### (Relevant to all Causes of Action)

56. At all times relevant to this Complaint, Defendant ERCS utilized "affiliates" that aided businesses in qualifying for unrestricted COVID-relief tax rebates with approval for fast qualification and for which it claimed the IRS would distribute payment within 4-6 months.

57. These affiliates used language throughout their website to encourage potential customers to sign up quickly, rather than cautiously, by warning that customers should act quickly, even so far as calling it a "money grab" of some sort.[8]

58. Upon information and belief, affiliates were to gather basic client information and documents, after which, the entire customer package goes to its processing partner, ERCS.

59. At all times relevant to this Complaint, Defendants reached out to potential clients and advised them to apply for ERTC.[9] These marketing attempts by Defendants were extremely aggressive and made with the intention of pushing prospective clients to enter into agreements with the Defendants.[10]

60. At all times relevant to this Complaint, Defendants marketed ERCS as a company that "Specializes in Maximizing ERC Funding for Small Businesses" on its company website. To bolster its reputation and maliciously inflate the value of its services, Defendants used online

---

[8] *See* video statement of CEO Troy Hyde at
https://f.hubspotusercontent30.net/hubfs/19545538/Files/CEO%20Welcome%20V2.mp4
[9] *See* https://www.nbcnews.com/news/investigations/bogus-tax-service-specialists-duped-business-owners-latest-covid-relie-rcna147183.
[10] *Id.*

advertisements to make misleading representations to potential clients. Specifically, Defendants'

online advertisements represent that it had specialized knowledge and skillsets to conduct a proper

qualification analysis. Some of these statements included:

> "*We evaluate your claim in every way possible to ensure we maximize your credit.*"
>
> "*Our team strictly focuses on ERC allowing us to be the experts and resulting in more funding for your business.*"
>
> "*While the general qualifications for the ERC program seem simple, the interpretation of each qualification is very complex. Our significant experience allows us to ensure we maximize any qualifications that may be available to your company.*"
>
> "*At ERC Specialists we have decades of payroll experience, which has allowed us to specifically focus to understanding and maximizing the ERC program.*"

61. In a marketing video, featuring Defendant Mark Sullivan states, "We evaluate each

company using the IRS Guidelines to maximize this credit and select the path that provides the

most certain qualification…" See https://www.youtube.com/watch?v=j9hluHuVBEo 2:57-3:05.

ERCS, in the same video, further admits, that all one has to do to start their process is go to their

website and "Click begin qualifying to input your business information into our system to

determine whether or not you qualify. If we feel you are a good candidate for the program, we'll

give you an estimate of how much you can receive in ERC Credits". See

https://www.youtube.com/watch?v=j9hluHuVBEo at 3:51-4:03. In fact, Sullivan states that they

will provide a good idea of a company's qualification in 5 minutes through ERCS' website. See

https://www.youtube.com/watch?v=OMLXF8CDgXE at 3:24-3:26.

62. Defendants provided an online intake questionnaire for Plaintiffs to complete, regarding

its potential for eligibility to obtain the ERTC. A simple review of the responses provided in the

questionnaire to Defendants would indicate to anyone (especially self-proclaimed "experts") that

further analysis is required, as the responses alone are wholly insufficient to determine a valid ERTC claim.

63. Worse, even if a prospective client denied sustaining a full or partial suspension, denied a reduction in revenue, or denied supply-chain disruptions by COVID-related mandates, ERCS's questionnaire often populates a large dollar amount of potential credit the company would be eligible for.

64. Despite this, ERCS continually claims this survey is enough to become "approved" for the ERC. When articulating how the ERCS process works, Zieglowsky habitually expressed how easy and time-efficient everything is. Time after time, on podcast after podcast, Zieglowsky used the same language to promote his business. He would explain that "we're making it as simple as possible…" and would explain "we [ERCS] will go through the motions with you and we'll come back to you and say how much you're approved for to the penny…".[11]

65. Likewise, Defendant Zieglowsky, on numerous occasions, advised individuals not to pre-qualify themselves, stating "I always tell people don't prequalify yourself, we have made it very automated that you can go ask those questions…I tell people it is hard in this program to commit fraud…"[12] During the Teaching Millionaires podcast, Zieglowsky repeats this rhetoric, stating "I tell people all the time, don't prequalify yourself either, at the very beginning people would always say well, would I qualify based on this, this, this, this - don't prequalify yourself."[13]

66. Defendant Zieglowsky rearticulated the almost exact same business model as Defendant Sullivan, stating, "The way the structure is here, where a business owner this is very simple for the business owner. Where they only need about five to ten minutes to go through the survey questions

---

[11] *See* https://www.youtube.com/watch?v=fl-PO01po_U at 18:04-18:07; *See also*
https://www.youtube.com/watch?v=fl-PO01po_U at 19:24 to 19:29
[12] *See* https://www.youtube.com/watch?v=fl-PO01po_U at 15:25-15:45
[13] *See* https://www.youtube.com/watch?v=KoH3ORvd3rU at 16:58-17:05

per EIN..." [14] "Then it takes us about two weeks to come back and say okay you're approved for $311,000.42. Do you want us to file?"[15]

67. Zieglowsky goes on to explain the importance of filling out the survey when determining qualification, going as far as to say taxpayers should not attempt to make the determination without the survey on ERCS's website.

68. Defendant Sullivan bolsters ERCS's work product by touting that ERCS completes the process in just a few weeks and provides "a full audit library to support" your qualification.[16]

69. However, once it became clear that the IRS was beginning to scrutinize ERTC, ERCS sent out correspondence to its customers stating that they could not handle an appeal on client's behalf because they "do not have the ability to do that. Part of the reason for this is we do not have the documentation necessary for a successful appeal.  We were only provided payroll and 941s to calculate your credit, but this denial is based on Gross Receipts which requires financial records that we don't have."[17]

70. While taxpayers are no longer able to claim ERTC, the IRS has made clear that there is a backlog of over a million ERTC claims pending review.[18] Yet, as of August 6, 2024, Defendants were already sitting at a little over 2,000 disallowances by the IRS for taxpayers they qualified for this tax credit.[19]

---

[14] *See* https://www.youtube.com/watch?v=KoH3ORvd3rU at 14:52-14:59
[15] *See* https://www.youtube.com/watch?v=KoH3ORvd3rU at 15:29-15:36; *See also* https://www.youtube.com/watch?v=cM5hCkqeGQw at 3:47-3:57 ("When you go through our website there is about a five to 10-minute question survey that will help you decide and know if you qualify or not…").
[16] *See* https://www.youtube.com/watch?v=OMLXF8CDgXE at 3:06-3:12
[17] *See* taxrebatespecialists.us at #5 – Example of an excellent ERCS response to an upset customer (August 13, 2024);  *See also Id.* at #6 – ERCS email to Tax Rebate Specialists and other affiliates (August 22, 2024) (stating again "We want to point out that we do not have the documentation necessary to result in a successful appeal…").
[18] This information is based on reports from the IRS as of October 26, 2024.  No further updates known to Plaintiff have been provided by the IRS.
[19] *See* taxrebatespecialists.us at # 4 – What ERCS is doing to help customers with the recent disallowal [sic] notices from the IRS (August 6, 2024).

71. At all times relevant to this Complaint, Defendants encouraged potential clients (or rather, instilled fear in potential clients) not to consult with a CPA regarding their eligibility for ERTC. This was accomplished by making statements and displaying fake client testimonials on the ERCS website,[20] all of which implied that a CPA would be incorrect in determining that the potential client's business did not qualify for the ERTC. Some of these statements included:

> *"No need to be the guinea pig for your CPA. We average 10-20% more funding than a CPA not familiar with the program."*

> *"When I heard about the ERC program I reached out to my CPA. 30 minutes later he called and said I didn't qualify. Out of curiosity, I had ERC Specialists see if I qualified. Turns out I received the ERC for 7 of my 9 employees. Highly recommended. - Scott Moore"*

> *"The challenge is the ERC credit is taken on your payroll returns and not through your business income tax returns, which is what most CPA's handle. Because of this most CPA's don't process this credit"*

> *"My accountant told me we didn't qualify, but Tax Rebate Specialists helped our company get the ERC refund for 8 of our 10 employees. – Mitchell W."*

> *"What if I've been told my business doesn't qualify? Our team has already recovered over $1.1 billion dollars in refunds that businesses were entitled to. Many times for companies who were previously told they didn't qualify."*

> *"Why can't my CPA do this? There are over 70,000 pages of tax code; it's impossible to be an expert on all of them. ERC is all we do. It's like the difference between your family doctor and a neurologist. By concentrating on this one program, we understand the intricacies and nuances involved…"*

72. ERC doubles down on this in a marketing video stating "many CPAs are referring their clients to our business because most don't have the expertise to handle this. And with this amount

---

[20] Some of these testimonials were even made using the identities of individuals financially incentivized through the ERCS "affiliate" program.

of funding available, we don't believe using your business as a guinea pig to learn about this credit is the best idea."[21]

73. In the same video, they feature a client "Scott" who discusses how he contacted his CPA about ERC, who within thirty (30) minutes disqualified him. However, after talking with ERCS, he was qualified for seven (7) of his nine (9) employees. *Id*. at 5:15-5:32.[22]

74. Defendant LGS followed suit, noting situations where CFOs, CPAs, payroll company and tax attorney all advised that a company did not qualify for ERTC but they were able to qualify for over 10 million dollars in ERTC.[23]

75. At all times relevant to this Complaint, Defendants put forward advertisements and made statements and representations regarding their services, expertise, and client satisfaction, which were intentionally false and misleading.

76. For example, ERCS claimed they submitted a taxpayer's completed package to the least busy IRS office, processing the application even faster. The IRS tells us to expect to wait six to eight months, but many of our clients get their checks in four months or less.  In reality, all ERTC claims were only processed in two (2) specific IRS offices located in either Cincinnati or Ogden, with no preferential treatment to any tax preparer or taxpayer.[24]

77. At all times relevant to this Complaint, Defendants lacked any more knowledge, skill, or ability to determine eligibility for the ERTC, over an ordinary tax preparer, CPA, or layperson.

---

[21] *See* https://www.youtube.com/watch?v=OMLXF8CDgXE at 2:44-2:55
[22] Upon information and belief, the "Scott" featured in this video is the same client testimonial by "Scott Moore" in paragraph 71. "Scott Moore" is also featured on LGS's website.
[23] *See* https://us02web.zoom.us/rec/play/eSCf44ef80HTh7O9yGTlcBNXmhIz952miXh5EfNa2nSJ3P-Ewk0ZJNj0J62Yi-cNpFjETEHvYMCFtTk.h-VCbjIZe_JGw2eP?eagerLoadZvaPages=sidemenu.billing.plan_management&accessLevel=meeting&canPlayFrom Share=true&from=share_recording_detail&startTime=1627241620000&componentName=rec-play&originRequestUrl=https%3A%2F%2Fus02web.zoom.us%2Frec%2Fshare%2F4jJnM4FxpUCb1VjQmyYtYQ yafdP5uZ3fGZazO1Xn9e_exzMlp1qfYbliHZ9ub7lZ.Bq9nDJS6nwu02lWW%3FstartTime%3D1627241620000 at 2:18-2:33.
[24] *See* https://www.irs.gov/filing/where-to-file-your-taxes-for-form-941-x

78. The technical systems, presumably which include the often-referenced survey, were created by Atkinson, who as of May 17, 2022, was the Chief Technology Officer of ERCS.

79. Prior to his employment with ERCS, Atkinson's sole experience was as a salesman. Atkinson himself admitted that when he started with ERCS he had none of the skills necessary to do the work ERCS allowed him to do and would often get 'confused looks' when people inquired about his prior experience.

80. The ERTC is only available to certain employers that paid qualified wages to some or all employees after March 12, 2020, and before January 1, 2022 (during the COVID-19 pandemic), and who met the requirements for eligibility.[25]

81. However, depending on an employer's industry, the basis claimed for the credit, and the specifics for how an employer was impacted during the COVID-19 pandemic, the determination as to whether or not a business is eligible to claim the ERTC, which quarters it is eligible in, and the amount in which it can claim, can range from a simple review of financials to a complex qualification analysis related to a company's operational disruptions. Moreover, the IRS produced multiple "IRS Notices" to help guide taxpayers through qualification. The use of these notices is completely omitted from the survey.

82. Interestingly, ERCS has shown a pattern of inconsistently describing the complexities of the Employee Retention Credit and the surrounding tax code. In one breath, the company alleges they have "dedicated and experienced accounting staff to help businesses navigate the more than two-hundred official IRS documents to maximize the value of this credit" but in the next state,

---

[25] This was later amended by subsequent legislation to only include wages up to September 30, 2021.

"Our simple five-step process is designed to make this quick and easy…" https://www.youtube.com/watch?v=j9hluHuVBEo at 1:29-1:35; 3:40-3:45).[26]

83.    ERCS simultaneously claims they are merely the company that quantifies and files on behalf of the taxpayer and should not be held responsible for anything the taxpayer puts into their survey. If ERCS was truly just a calculator of the credit, what is the purpose of the survey that ERCS holds in such high regard?

84.    At all times relevant to this Complaint, Defendants were aware, or had reason to be aware of, the flaws in their claim determination process. Given below the reviews of customers who like Plaintiffs, were misled and filed for ERTC for which they were clearly not entitled. Like Plaintiffs, the Defendants found these individuals eligible and induced them to enter into agreements with them as specified below[2728]:



---

[26] These two contradicting statements came from the same marketing video, minutes apart (Emphasis Added)
[27] *See* https://www.trustindex.io/reviews/bestercexpert.com.
[28] *See* https://www.bbb.org/us/ut/orem/profile/tax-consultant/erc-specialist-1166-90037098/complaints.



**Initial Complaint**
01/16/2025

**Complaint Type:** Service or Repair Issues
**Status:** Unanswered

In 2023, we filed paperwork with the ERC Specialists to see if we qualified for the ERC (Employee Retention Credit). They claimed that we did and filed the documents with the government. We received the money from the government and paid ERC Specialists $12027.07 on 6/27/2023 for Invoice 160381. Upon reviewing all the information and with updates to the qualifications by the government, our accountant told us that we should not have qualified for ERC and need to submit paperwork to withdrawal our claim and send the money back. Under his advisement and education in the matter, we did this and reached out to ERC Specialists to let them know that we should not have qualified and that we were returning the money through the VDP process that the government set-up for this very reason- businesses that should not have qualified for ERC. The customer service rep at ERC Specialists told us that once we have proof of returning the money, to send that and copies of our paperwork in so that they could review our account and make adjustments to our payment. We did this and followed up with communications asking them to return the money paid, since they wrongly advised us and submitted the claim that we should have qualified for this. They said they would not be returning any money for payment for this service. We did everything on our end and we just want our fee returned to us.



Paul M
                                                                    11/06/2024

ERC Specialists misled us into thinking we qualified for the tax refund. After we received the checks, our accountant questioned whether or not we were qualified. I requested information from ERC Specialists several times concerning how they determined that we were qualified. They refused to give us any documentation, claiming it was proprietary information. Consequently, a third-party expert was consulted who determined that we were NOT qualified. We filed amended 941-X's and returned all of the money to the ***, including penalties/interest. ERC Specialists were made fully aware of this. However, over a year since the funds were returned, ERC Specialists are still trying to collect over $34,000 for their "service". Every few months they have a new representative dealing with our case who doesn't seem to know any of the history. Stay far away from this fraudulent company.

85.    The above reviews clearly show the strategy and practice employed by the Defendants and is a small example of how the enterprise affected not only Plaintiffs, but small businesses across the United States.

86.    Notably, Defendants' websites do not highlight certain pertinent points regarding ERTC. Defendants should have specifically mentioned that ERTC is only available to certain employers

who paid qualified wages to some or all employees after March 12, 2020, and before January 1, 2022 (during the COVID-19 pandemic), and who met the requirements for eligibility.

87.    Further, they should have repeatedly highlighted that depending on the employer's industry, the basis claimed for the credit, and the specifics for how an employer was impacted during the COVID-19 pandemic, the determination as to whether or not a business is eligible to claim ERTC, which quarters it is eligible for, and the amount in which it can claim, can range from a simple review to a complex qualification analysis.

88.    Instead, Defendants simply provide an online intake questionnaire for prospective clients to complete. It then conducts a cursory review of the responses provided in the questionnaire and concludes businesses are eligible for ERTC.

89.    Even if a prospective client denied sustaining a full or partial closure, denied reduced revenue, or denied supply-chain disruption caused by COVID regulations, the ERC rebate questionnaire would populate a large dollar amount of potential credit, claiming it was what the company would be eligible for.

90.    What happened to the Plaintiffs is a perfect example of the outcome of Defendants' carefree, profit-focused enterprise. By luring in Plaintiffs unsophisticated in federal tax credits during a vulnerable time, and inducing them to rely on expertise that is misrepresented, Plaintiffs, and taxpayers like Plaintiffs, are convinced to file federal tax forms often for large amounts of money. Defendants conducted little to no meaningful analysis of Plaintiffs eligibility to receive ERTC and failed to accurately ascertain the basis for Plaintiffs eligibility, the quarters Plaintiffs were eligible for, and the amount of ERTC that Plaintiffs were entitled to receive. In fact, the last line of the Agreements executed by Plaintiffs, state:

> "*By signing this agreement, I understand and acknowledge that the appropriate returns necessary to obtain the ERC credit will be*

> *prepared and filed. Once filed those returns cannot be rescinded or revoked. My signature below evidences my permission for ERC Specialists to do so.*" Exhibit A.

91.    Attached to the Agreement was Plaintiffs' responses to the survey from ERCS, in which they specifically noted they had no decline in gross revenue for any of the relevant quarters for ERTC, and only indicated there were possible suspensions without providing any material level of detail or substantiation. Exhibit B.

92.    ERCS qualified Plaintiffs for different quarters without providing any justification as to how they arrived at any of the specific figures. Specifically, as stated *supra* in paragraph 11, Defendants identified the following Employee Retention Credits for Plaintiffs:

| Hettinger Excavating | |
|---|---|
| Quarter / Year | Credit |
| Q2 2020 | $    57,547.00 |
| Q3 2020 | $    37,343.00 |
| Q4 2020 | $    13,920.00 |
| Q1 2021 | $  149,998.00 |
| Q2 2021 | $  152,475.00 |
| Total | $  411,283.00 |

| Hettinger Trucking | |
|---|---|
| Quarter / Year | Credit |
| Q2 2020 | $    15,290.00 |
| Q3 2020 | $    16,373.00 |
| Q4 2020 | $      4,015.00 |
| Q1 2021 | $    21,793.00 |
| Q2 2021 | $    17,467.00 |
| Q3 2021 | $    43,269.00 |
| Total | $  118,207.00 |

93.    To claim ERTC, taxpayers are required to file an amended Form 941, known as a Form 941-X *for each quarter* in which they qualified.

94.    Form 941-X is an official IRS form filed by employers to adjust their quarterly federal tax return or claim for refund. It was this form that ERCS was executing and filing for Plaintiffs, and clients in general.

95.    As Defendants misled Plaintiffs into believing they qualified for multiple different quarters, a Form 941-X was filed for each of those quarters claiming ERTC.

96.    For all quarters, Defendant Geri Bohn executed the 941-X forms for ERCS.

97.    Additionally, ERCS induced Plaintiffs to sign Form 8821, a Tax Information Authorization, which allowed Defendants to circumvent Plaintiffs and have direct access to Plaintiffs' confidential tax information.

98.    Bohn personally signed these forms. This was allegedly necessary for Bohn to gain access to Plaintiff's payroll information.

99.    Upon information and belief and during all relevant times to this Complaint, Bohn is the Director of Fulfillment for ERCS.

100.   Upon information and belief and during all relevant times to this Complaint, Bohn held herself out as a Certified Payroll Professional with knowledge and expertise in ERTC.

101.   Each of the Forms 941-X signed by Bohn was done so under oath based on all information of which the preparer has knowledge.

102.   Each of the Forms 941-X signed by Bohn were transmitted via the internet for signature using Docusign.

103.   Each of the Forms 941-X were executed and transmitted via the internet *prior* to the signing of the Agreements between Plaintiffs and Defendants.

104. Upon the representations made by Defendants as to the accuracy of their qualification analysis, Defendants induced Plaintiffs to allow ERCS, to file the Form 941-X on behalf of Plaintiffs, without further discussion.

105. Subsequently, an invoice was sent to Plaintiff Hettinger Trucking LLC via the internet, requesting payment in the amount of $17,731.12.

106. Plaintiffs duly paid Defendants the entire amount of the invoice via check.

107. Likewise, an invoice was sent to Plaintiff Hettinger Excavating via the internet, soliciting payment pursuant to the agreement in the amount of $61,692.45.

108. Plaintiffs duly paid Defendants the entire amount of the invoice via check.

109.  It was subsequently determined that Plaintiffs do not qualify for most of the quarters Defendants qualified Plaintiffs for.

110. Based upon that determination, Plaintiffs utilized the VDP program for all quarters for which they were qualified except Q2 of 2020.

111. Plaintiffs subsequently entered into the Voluntary Disclosure Program.

112. Plaintiffs were accepted into the program and complied with the program requirements, promptly refunding 80% of the claimed credit to the IRS for all quarters except Q2 of 2020.[29]

**CAUSES OF ACTION**

**COUNT I – VIOLATION OF 18 U.S.C. § 1962(c)**

---

[29] The Voluntary Disclosure Program or "VDP" is an application process introduced by the IRS to address issues arising from ineligible claims for the Employee Retention Tax Credit. If a company meets the requirements and is accepted into the program, the company is only required to repay 80% of the claimed credit for the quarters in which it applied to the program. *See* https://www.irs.gov/coronavirus/frequently-asked-questions-about-the-employee-retention-credit-voluntary-disclosure-program.

113.  Plaintiffs incorporate herein by reference the foregoing paragraphs.

114.  Plaintiffs allege that Defendants, inclusive of all leadership, principal agents, and others known and unknown to Plaintiffs, were members and associates of an "enterprise" (hereinafter referred to as the "Enterprise"), as defined by 18 U.S.C. § 1961(4). That is, they are a group of individuals associated in fact, although not a legal entity. The Enterprise consisted of (i) ERCS, the entity; (ii) all affiliate entities, shell corporations, escrow agencies; (iii) individuals employed by and associated with all entities previously mentioned; and (iv) all others known and unknown.

115.  Plaintiffs allege that Enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise. The Enterprise was engaged in, and its activities affected interstate commerce in that ERCS and all other Defendants named and unnamed herein, advertised and marketed their services and company(s) to businesses nationwide. The Enterprise operated primarily out of Utah.

116.  Plaintiffs allege that Defendants, and all others known and unknown, deliberately participated in unlawful, fraudulent, and deceptive activities, and conspired to commit these activities, to conduct the affairs of the Enterprise.

117.  Plaintiffs allege that the purpose of the Enterprise included preserving, protecting, promoting, and enhancing the power, reputation, and brand of ERCS, and all individual Defendants, affiliates, whether known or unknown to Plaintiffs, to enrich the members of the Enterprise at the expense of Plaintiffs.

118.  Plaintiffs allege that the purpose of the Enterprise was to undertake a financial scheme to collect a contingency fee for their "services", that related to their provision of a fraudulent and/or vastly inflated value of Plaintiffs' ERTC claim.

119. Defendants' conduct, and the conduct of each Defendant named herein, constitutes racketeering as set forth in 18 U.S.C. § 1964(c). Specifically, Congress has defined "racketeering activity" to be "any act which is indictable under any of the following provisions of title 18, United States Code",[30] inclusive of: Mail Fraud (18 U.S.C. § 1341) and Wire Fraud (18 U.S.C. § 1343).

120. Defendants in this case engaged in multiple instances of mail fraud, wire fraud, and monetary transactions in property derived from unlawful activity by filing fraudulent ERTC claims with the Internal Revenue Service on behalf of the Plaintiffs and accepting monetary payment from the Plaintiffs for these unlawful services.

121. Plaintiffs allege that Defendants have knowingly conducted and/or participated, directly and indirectly, in the conduct of the affairs of the above-described Enterprises through a "pattern of racketeering activity" as defined under 18 U.S.C. § 1961(5).

122. Plaintiffs allege that such racketeering activity consists of repeated violations and the conspiracy to commit violations of Mail Fraud (18 U.S.C. § 1341), Wire Fraud (18 U.S.C. § 1343).

123. These predicate acts were part of a scheme and were not isolated events as Defendants filed multiple fraudulent claims on behalf of Plaintiffs with the IRS, and Defendants accepted payment across state lines in the aggregate amount of $79,423.50 for their "services" to Plaintiffs.

124. As a direct and proximate result of the Defendants' conduct, Plaintiffs were financially injured by having to retain a separate and professional tax consulting firm to determine that the claims filed by ERCS were fraudulent.

125. As a direct and proximate result of the Defendants' conduct, Plaintiffs were financially injured as they had to pay a significant sum of money to ERCS for what they believed were valid ERTC claims. Plaintiffs had also financially planned to utilize refund money in the ordinary course

---

[30] 18 U.S.C. § 1961(1)(B).

of business. However, the refund amount ultimately had to be returned to avoid facing harsh penalties. As such, the Plaintiffs were left without the benefit of the bargain entered into on execution of the Agreements.

126. In the alternative, Defendants received a windfall and consequently, should be required to return funds exceeding the amounts they are entitled to. If they are entitled to amounts above $0, which Plaintiffs do not believe to be true, then the most they would be entitled to would be 15% of the amounts received by Plaintiffs, which would be 15% of the 20% Plaintiffs were allowed to retain as a result of the VDP program. This is far less than amounts paid to Defendants and of which Defendants retain possession of.[31]

127. As a direct and proximate result of the Defendants' conduct, Plaintiffs were financially injured by having to retain counsel to assist them in the filing of this suit and all prelitigation attempts to have Defendants return Plaintiffs' fee.

128. 18 U.S.C. § 1962(c) provides relief against parties who engage in a pattern of racketeering activity, and Defendants have civil liability to Plaintiffs under this section of the U.S. Code.

129. 18 U.S.C. § 1964(c) states that "*Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 USCS § 1962] may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and*

---

[31] Plaintiffs firmly believe that the services for which they contracted for were not provided, and therefore, Defendants are not entitled to any monetary compensation. Additionally, the 20% Plaintiffs were allowed to retain was consideration for a contract, wholly separate from that entered into with Defendants, between Plaintiffs and the federal government. Defendants have no legal right to any benefit from that bargain, when they are not privy to said contract. Finally, any consideration received by Plaintiffs from the government is payment by a collateral source, and has no bearing on the nature, scope and payment terms contained in the agreement between parties to this suit. It is Plaintiffs position that allowing Defendants to retain any amount of money rewards fraudulent behavior by fraudulent actors, and equitable principles directly prohibit it. The alternative calculation, however, is presented to demonstrate a maximum amount that Defendants could plausibly argue they are entitled to, should a question arise to actual damages sustained by Plaintiffs.

*the cost of the suit, including a reasonable attorney's fee*". Plaintiffs allege that Defendants are liable under this provision.

## COUNT II – CONSPIRACY TO VIOLATE SECTION 1962(c)

130.  Plaintiffs incorporate herein by reference the foregoing paragraphs.

131.  Defendants willfully combined, conspired, and agreed with one another and with others to violate Title 18, United States Code, Section 1962(c), that is, to conduct and/or to participate, directly or indirectly, in the affairs of the Enterprise, the activities of which were conducted through a pattern of racketeering activities, in violation of 18 U.S.C. section 1962(d).

132.  The facts presented clearly show that, two or more persons agreed to commit a substantive RICO offense. As also set forth herein, the Defendants knew of the essential nature of the Enterprise and agreed to the overall objective of the RICO offense. The object of this conspiracy was to defraud Plaintiffs, or entities like the Plaintiffs.

133.  As a direct and proximate result of the Defendants' conduct as set forth herein, Plaintiffs suffered damages in the amounts paid to Defendants, the additional cost associated with retaining a third party consultant to review Defendants' work and correctly perform an ERTC analysis, and in the cost associate with the time and expense to Plaintiffs in resources, monetary and non-monetary, used to address this nefarious position thrust upon them.

## COUNT III – UTAH PATTERN OF UNLAWFUL ACTIVITY ACT VIOLATIONS<br>UTAH CODE ANN. § 76–10–1603(3)

134.  Plaintiffs incorporate herein by reference the foregoing paragraphs.

135.  Plaintiffs allege that Defendants' conduct, and the conduct of each Defendant named herein, consisted of a pattern of unlawful activity as utilized in § 76–10–1605. Specifically, the Utah State Legislature has defined a "Pattern of unlawful activity" to be "*engaging in conduct which constitutes the commission of at least three episodes of unlawful activity, which episodes*

*are not isolated, but have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics*".[32]  For the purposes of this definition, "Unlawful activity" means "*to directly engage in conduct or to solicit, request, command, encourage, or intentionally aid another person to engage in conduct which would constitute any offense described by the following crimes or categories of crimes*".[33] These crimes or categories of crimes include (but are not limited to): Making a written false statement under Utah Code Ann. § 76-8-504;[34] Theft by deception under Utah Code Ann. § 76-6-405;[35] and any act illegal under the laws of the United States and enumerated in 18 U.S.C. § 1961(1)(B).[36]

### a.    *Written False Statement (Utah Code Ann. § 76-8-504)*

136. Plaintiffs allege Defendants engaged in multiple instances of making written false statements in official matters with the intent to deceive a public servant,[37] through the creation and submission to the IRS of Plaintiffs' ERTC claims using IRS Form 941-X.

137.  Plaintiffs allege that Defendants, despite knowing they were submitting a false claim for refund on behalf of Plaintiffs to the IRS, proceeded to file said claim(s), and therefore, made a written false statement to an employee of the U.S. Department of the Treasury and/or an employee of the IRS based out of the State of Utah.

138.  Plaintiffs allege that Defendants had the intent to have the above public servant process the fraudulent claim in the course of their normal government function.

### b.    *Theft by Deception (Utah Code Ann. § 76-6-405)*

---

[32] Utah Code Ann. § 76-10-1602(2).
[33] Utah Code Ann. § 76-10-1602(4).
[34] *Id*  ¶ (rrr).
[35] *Id* ¶ (hh).
[36] *Id.* ¶ (iiiii).
[37] For purposes of § 76-8-504, "Public servant" means a person hired or paid by a public entity to perform a government function. Utah Code Ann. § 76-1-101.5(16)(a)(iii).

139.  Plaintiffs allege that Defendants engaged in instances of theft by deception by obtaining property (payment) from Plaintiffs. Defendants' made use of deception through "puffing"[38] the worth of their services both verbally and through false advertisements, with the purpose of depriving Plaintiffs of money.

140.  Based on facts previously stated, Plaintiffs further allege that Defendants intentionally puffed their worth for the purpose of obtaining money from potential customers under fraudulent pretenses.

141.  Plaintiffs allege that at the times relevant herein, Defendants advertised and misled potential customers to believe that they had "Advisory Board Members" consisting of the State of Utah Attorney General (Sean Reyes), the Former U.S. Attorney General (Matt Whitaker), and more highly credible individuals, to "puff" their worth. Plaintiffs further allege that Defendants intentionally puffed their worth in this manner for the purpose of obtaining money from potential customers under fraudulent pretenses.

### c.    Act(s) Illegal under 18 U.S.C. § 1961(1)(B)

142.  Lastly, as described in paragraphs set forth above, Defendants engaged in Racketeering which is an act illegal under the laws of the United States and enumerated in 18 U.S.C. § 1961(1)(B).

143.  In summary, Plaintiffs allege a cause of action for violation of the Utah Pattern of Unlawful Activity Act. Section 76-10-1605 of the Code provides civil remedies to persons injured by a pattern of unlawful activity. Defendants individually have civil liability to Plaintiffs under this section, and should be awarded two times the damages sustained, costs of this suit, and reasonable attorney fees.[39]

---

[38] 2 Utah Code Ann. § 76-6-405(1)(a).
[39] Utah Code Ann. §§ 76-10-1605(1), (2).

## COUNT IV - TRUTH IN ADVERTISING VIOLATIONS
## UTAH CODE ANN. § 13-11a-3(1)

144.  Plaintiffs incorporate by reference the paragraphs set forth above.

145.  Deceptive trade practices occur when, in the course of a person's business, vocation, or occupation that person: (b) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (c) causes likelihood of confusion or of misunderstanding as to affiliation, connection, association with, or certification by another; and (i) advertises goods or services or the price of goods and services with intent not to sell them as advertised.[40]

146.  Based on facts and allegations previously stated in paragraphs set forth above, Plaintiffs allege that Defendants intentionally misled Plaintiffs into believing that Defendants would perform a comprehensive analysis of whether or not Plaintiffs qualified to claim the ERTC.

147.  Based on facts and allegations previously set forth above, Plaintiffs further allege that Defendants intentionally misled Plaintiffs into believing that Defendants were backed by government officials, leaders, and more, and were a team inclusive of certified payroll administrators, and attorneys, creating a more reliable appearance.

148.  Plaintiffs allege Defendants knowingly advertised a service they had no intention of providing, in that they marketed themselves as capable of conducting a better analysis than a CPA, for claiming the ERTC.

149.  Plaintiffs further allege that, in reality, Defendants had no intention of conducting said analysis, had no intention of communicating with Plaintiffs to gather additional information relevant to its claim, and had no intention of filing a valid legal ERTC claim with the IRS.

---

[40] Utah Code Ann. §§ 13-11a-3(1)(b), (c), (i).

150.   Defendants advertised a guarantee on their website that they had no intention of upholding, to induce prospective clients into entering into an agreement with them.

151.   In summary, Plaintiffs allege a cause of action for violation of the Utah Truth in Advertising/Deceptive trade practices statute. Section 13-11a-4 of the code provides civil remedies to persons injured by deceptive trade practices.[41] Defendants have civil liability to the Plaintiffs under this section and should be awarded damages sustained, pre- and post-judgment interest, costs, and reasonable attorney fees.

## COUNT V – BREACH OF CONTRACT

152.   Plaintiffs incorporate by reference the paragraphs set forth above.

153.   Plaintiffs and Defendants entered into written contracts, the Engagement Agreements, as described above. Those Agreements, executed by both parties, set forth the obligations of each side: ERC Specialists agreed to provide ERC qualification analysis and filing services to Plaintiff, and Plaintiff agreed to pay a contingency fee of the credit obtained.

154.   Plaintiff fully performed its obligations under the contract, by providing all information and documentation reasonably requested by Defendants in connection with the ERC filings. Plaintiffs paid Defendants the agreed fee portion in a timely manner. In short, Plaintiff did everything that was required of it under the Agreement.

155.   Defendants materially breached the contract in multiple ways, fundamentally failing to deliver the contracted-for services in a competent or lawful manner. The Agreements required Defendants to conduct a good-faith analysis of Plaintiff's ERC eligibility consistent with professional standards and IRS rules. Defendants breached this duty by performing only a cursory review and effectively rubber-stamping Plaintiffs' eligibility. They did not analyze Plaintiffs'

---

[41] Utah Code Ann. §§ 13-11a-4(b)(c)(i-ii).

specific circumstances against the ERC criteria in any meaningful way. Defendants failed to consider or apply the appropriate Internal Revenue Code. This negligent and reckless approach resulted in incorrect advice that Plaintiffs qualified, which was a fundamental failure of the service Defendants were supposed to provide. In essence, Defendants did not do what they promised (determine eligibility accurately); instead, they breached by providing false results.

156. Defendants were obligated to prepare accurate tax filings if they were going to submit forms on Plaintiff's behalf. Submitting knowingly incorrect information to the IRS (claiming credits that were not actually available) is a breach of the contract. Plaintiffs did not bargain for a fraudulent filing; Plaintiffs bargained for a legitimate credit claim, if eligible. By causing Plaintiffs to file false returns, Defendants materially breached the purpose of the contract.

157. Additionally, or alternatively, Defendants' breaches resulted in a total failure of consideration for Plaintiff's payments. The purpose of the Agreements from Plaintiffs' perspective was to obtain a lawful tax credit. Defendants' breaches led to Plaintiffs claiming an inaccurate tax credit, despite Plaintiffs paying the full amount in fees. In contract terms, Defendants failed to deliver the essential bargained-for performance.

158. To the extent required, Plaintiffs gave Defendants notice of their breaches when Plaintiffs discovered the ineligibility issue and demanded that Defendants return the fees. Defendants did not cure any of their breaches as they did not refund the fees nor could they undo the fact that they had given bad advice and filed false claims. Therefore, any obligation of Plaintiffs to perform further under the contract was terminated.

159. As a direct result of Defendants' breach of contract, Plaintiffs has suffered damages. These damages include the $79,423.50 in fees paid to Defendants, as well as professional fees paid to rectify the situation. Defendants clearly breached the duties in the Agreement by inadequately

analyzing Plaintiffs' material documents and incorrectly qualifying Plaintiffs' businesses and miscalculating the credit. Defendants failed to consider the applicable Internal Revenue Code Sections, Treasury Regulations, and Notices in analyzing and determining Plaintiffs' eligibility for ERTC.

160.  Plaintiffs are entitled to the equitable remedy of rescission with respect to the Contract based upon the following, considered individually, collectively or in combination:

A. Rescission – Defendants' Agent(s) Misrepresentations

Plaintiffs entered into the contracts based upon the material misrepresentations of Defendant, including:

(1) Defendants' misrepresentation that Defendants were experts and specialists in ERC tax refund matters including analyzing and determining eligibility for ERC refunds.

(2) Defendants' misrepresentation that Plaintiffs were legally eligible to receive and keep ERC tax refunds; and

(3) Defendants' misrepresentation that it would only be entitled to the contingency fee if Plaintiffs actually received and kept ERC tax refunds.

Defendants knew that its misrepresentations would induce a reasonable person to enter into the contracts and that it would likely induce Plaintiffs to do so.

B. Rescission – Unilateral Mistake

Plaintiffs deny Defendants' position that it is entitled to a contingency fee on monies that Plaintiffs returned to the IRS, but if Defendants prevail on its contractual position:

(1) Plaintiffs made a unilateral mistake in agreeing to such provisions and enforcement of that provision would be so grave in consequence as to be unconscionable.

(2) Plaintiffs' unilateral mistake with respect to the circumstances under which the contingency fee would be payable is a material feature of the contract.

C. Rescission – Mutual Mistake

(1) At the time the contract was entered into, Plaintiffs and Defendants had a misconception about a basic assumption, *i.e.* that Plaintiffs were legally eligible to receive ERC tax refunds.

(2) It was only after the execution of the contracts that it was discovered that Defendants' analysis and determination of Plaintiffs' eligibility, as well as its professional advice to Plaintiffs that they were legally eligible to receive ERC tax refunds, was determined to be wrong.

D. Rescission – Frustration of Purpose

(1) The principal purpose of the contract was for Defendants to obtain ERC tax refunds for Plaintiffs. The determination that Plaintiffs were not legally eligible for ERC tax refunds was an unforeseen event since, prior to entering into the contracts, Defendants advised Plaintiffs that, based on their expertise and specialized knowledge, Defendants had found that Plaintiffs were legally eligible.

(2) Once it was determined that Plaintiffs were not legally eligible for the ERC tax refund, the performance of the contracts was radically different from the performance of the contracts that was originally contemplated by both Plaintiffs and Defendants.

(3) Both Plaintiffs and Defendants knew that Plaintiffs' receiving and keeping the ERC tax refund was the principal purpose of the contracts and that Defendants' fee was contingent on Plaintiffs keeping the refund monies.

(4) Since Plaintiffs returned the ERC refund to the IRS by means of the formal withdrawal process or VDP, performance of the principal purpose of the contracts has been frustrated.

E. Rescission – Impracticability

(1) After the contracts were entered into, an unforeseen event occurred, *i.e.* that Defendants were wrong – Plaintiffs were not legally eligible to apply for or receive ERC tax refunds. That event renders the Defendants' request for the payment of a contingency fee impractical or impossible because Plaintiffs returned a majority of the refund monies from which the contingency fee was to be paid.

161. All of the foregoing support rescinding the Contract in order to avoid an unjust, inequitable and unconscionable result.

## COUNT VI - AGAINST ALL DEFENDANTS FOR COMMON LAW FRAUD

162. Plaintiffs incorporate by reference the paragraphs set forth above.

163. Defendants, personally or through agents acting at their direction, have made or caused to be made false and fraudulent material misrepresentations of fact to Plaintiffs; specifically, false and misleading statements and representations concerning the quality and accuracy of the services provided by Defendants. The scheme has been set forth herein the paragraphs above.

164. Defendants also deliberately failed to inform the Plaintiffs of the actual nature of the employment retention credit program and the Plaintiffs' eligibility for the same. Instead, Defendants made blanket statements with knowledge or reckless disregard of the veracity of its statements. At the time the statements and representations were made, as detailed in the above paragraphs, Defendants were aware of the falsity of the misrepresentations.

165. Defendants made the misrepresentations with the intent to deceive Plaintiffs and with the intent that Plaintiffs would act on the misrepresentations by paying sums of money in fees. This injury is set forth more fully in the paragraphs above. Plaintiffs are also entitled to consequential damages and exemplary damages in an amount to be determined at trial.

**COUNT VII - AGAINST ALL DEFENDANTS FOR COMMON LAW CONSPIRACY**

166. Plaintiffs incorporate by reference the paragraphs set forth above.

167. Defendants have willfully combined, conspired, and agreed with each other and others to defraud Plaintiffs. Defendants, in combination with themselves and others, knowingly made false and misleading statements regarding the existence, nature, and scope of Plaintiffs' claims for ERTC.

168. The object of the conspiracy was to defraud Plaintiffs and entities like the Plaintiffs. There was a meeting of minds and an agreement on this course of action by each Defendant, and each Defendant played a specific role in the overall scheme to defraud Plaintiffs and other entities like Plaintiffs.

169. Defendants, separately or in concert with other Defendants and/or other parties, committed overt, unlawful acts in furtherance of this course of action. The roles of the conspirators and overt acts are set forth above.

170. The false and fraudulent misrepresentations and omissions alleged above, were made by Defendants with the purpose and intent to deceive Plaintiffs, and to induce Plaintiffs to enter into the Agreements with the Defendant, ERCS and pay sums of money, for which Defendants were not legally entitled, given the poor quality of the services rendered by Defendant ERCS.

171. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered a loss of benefits in the form of tax credits. Plaintiffs have also been compelled to retain third party

investigators to determine its actual eligibility for ERTC and return the wrongly availed credit. Plaintiffs are also entitled to consequential damages and exemplary damages in an amount to be determined at trial.

## COUNT VIII - AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

172.  Plaintiffs incorporate by reference the paragraphs set forth above.

173.  Plaintiffs conferred a benefit upon Defendants by paying sums to resolve the ERTC claims at issue. Defendants have unjustly obtained this benefit from Plaintiffs, for work that did not involve even the basic due diligence.

174.  As a direct and proximate result of Defendants' conduct, Plaintiffs have paid payments, and Defendants have benefited from receipt of those payments. The money Defendants obtained as fees pursuant to the terms of the Agreements in equity and good conscience belongs to and should be returned to Plaintiffs.

175. To allow Defendants to retain a fee by and through breach of their own contract would create a windfall to which Defendants are not entitled.

## COUNT IX - AGAINST ALL DEFENDANTS FOR MONEY HAD AND RECEIVED

176.  Plaintiffs incorporate by reference the paragraphs set forth above.

177.  Plaintiffs conferred a benefit upon Defendants by paying sums to resolve the ERTC claims at issue. The money Defendants obtained in connection with the Plaintiffs ERTC claims in equity and good conscience belongs to and should be returned to Plaintiffs.

178.  Plaintiffs had to refund 80% of the ERTC refund received through the VDP mechanism. This in effect means Plaintiffs have received only 20% of the ERTC refund amount. However, under the terms of the Agreements, Plaintiffs were required to pay 15% of the *entire* ERTC refund

amount. As such, Plaintiffs have been put significantly out of pocket because of Defendants' actions.

179.  In equity and good conscience, Defendants should be required to pay restitution to the Plaintiffs that is equal and commensurate to the amount refunded by means of the VDP mechanism.

## DAMAGES

180.  Plaintiffs incorporate by reference the paragraphs set forth above.

181.  Plaintiffs have been damaged by Defendants' actions outlined in this Complaint.

182.  Regarding Counts I and II (RICO violations), Plaintiffs are entitled to a sum of $79,423.50. Plaintiffs are also entitled to the trebling of these damages pursuant to 18 U.S.C. §1964(c), as well as attorneys' fees and costs in an amount to be determined by the Court.

183.  Regarding Counts III and IV (Pattern of Unlawful Activity Act Violations and Truth in Advertising Violations), Plaintiffs are entitled to double the damages pursuant to Section 76-10-1605, as well as attorneys' fees and costs in an amount to be determined by the Court.

184. Regarding Counts V and VI (common law fraud and conspiracy), Plaintiffs are entitled to the amount by which Defendants' were unjustly enriched as well as exemplary damages to be determined at trial.

185.  Regarding Counts VII and VIII, (Unjust Enrichment and Claims for Money Had and Received) Plaintiffs are entitled to restitution for the amounts which Defendants obtained, which in equity and good conscience belong to Plaintiffs.

## JURY DEMAND

186. Plaintiffs demand a jury trial for all the causes of action stated herein.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, by and through undersigned counsel, respectfully request that upon final trial of this case, the Court enter a judgment against Defendants, each of them jointly and individually, with respect to each individual count alleged herein, inclusive of respective damages, costs, and attorney's fees.

Plaintiffs further request that the Court enter judgment against Defendants, each of them jointly and individually, for pre- and post-judgment interest, at the maximum rate allowed by law.

Plaintiffs further request that the Court enter judgment against Defendants, each of them jointly and individually, for exemplary damages in such amount as the finder of fact may award at its discretion and all such other and further relief, legal and equitable, special or general, to which Plaintiffs may be justly entitled.

Dated: August 20, 2025.                           Respectfully submitted,

                                                  */s/ Janine M. Campanaro*
                                                  JANINE M. CAMPANARO
                                                  Utah Bar No. 19774
                                                  Zerbe, Miller, Fingeret, Frank & Jadav
                                                  3009 Post Oak Blvd., Suite 1700
                                                  Houston, Texas 77056
                                                  Telephone: (832) 388-3944
                                                  jcampanaro@zmflaw.com

                                                  **ATTORNEY FOR PLAINTIFFS**